UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHARLIE JOHN WILLIAMS,

    Plaintiff,

v.                                                        Case No. 6:09-cv-912-Orl-28DAB

RICHIE ZAYAS, et al.,

    Defendants.
_____

## ORDER

This case is before the Court on Defendants Richie Zayas and Unknown United States Bureau of Alcohol, Tobacco, Firearms and Explosives Agents' ("Unknown Agents") Motion for Summary Judgment (Doc. No. 38), Plaintiff's Response in Opposition to the Motion for Summary Judgment (Doc. No. 50), Plaintiff's Motion for Summary Judgment (Doc. No. 40), and Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 44). As discussed hereinafter, Defendants' Motion for Summary Judgment is granted in part and denied in part and Plaintiff's Motion for Summary Judgment is denied.

*I.   Factual Background*[1]

Plaintiff, a federal prisoner proceeding *pro se*, filed the instant civil rights action alleging that Defendant Zayas, a special agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and other unknown ATF agents used excessive force

---

[1] In considering the motion for summary judgment, the statement of facts is derived from the Amended Complaint, declarations, and other evidence submitted by Plaintiff and Defendants in support of, or in opposition to, the dispositive motions.

against him in violation of the Eighth Amendment.[2] (Doc. No. 6 at 8.)

The facts surrounding the incident forming the basis of Plaintiff's claim are as follows. In June 2007, the ATF and the Orange County Sheriff's Office ("OCSO") began investigating a group known as the Corporate Thugz Entertainment Crew as suspects in armed robberies, armed home invasions, narcotic trafficking, illegal firearms, and homicides. (Doc. No. 38-1 at 2.) As a result of the investigation on June 14, 2007, Defendant Zayas, working undercover, met with Plaintiff, Mercutio Stokes ("Stokes"), and Kylund Johnson ("Johnson") at a restaurant in Orlando, Florida to discuss a home invasion robbery the four planned to commit that day. *Id.* Plaintiff told Defendant Zayas in relation to the robbery that "the plan was to kill everyone present in the stash house as soon as they entered." *Id.*

Based on the investigation, the ATF and OCSO intended to arrest Plaintiff, Stokes, and Johnson that day. *Id.* The ATF formed a Special Response Team ("SRT") to effectuate the arrest, and Defendant Zayas subsequently directed Plaintiff to drive to a storage facility which Defendant Zayas indicated had been rented by him to store his share of the cocaine they intended to steal from the robbery. *Id.* at 3. Plaintiff followed Defendant Zayas in his vehicle to the storage facility. *Id.* at 3. While in route to the storage unit, Defendant Zayas

---

[2]Although Plaintiff asserted a claim of excessive force in violation of the Eighth Amendment, the Court has previously construed Plaintiff's claim of excessive force during his arrest to allege a violation of the Fourth Amendment. See Doc. No. 25 at 5 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002), for the proposition that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.").

advised the SRT that he had observed a rifle in the vehicle at the feet of the front passenger. *Id.*

Once Plaintiff, Stokes, and Johnson arrived at the storage unit, Plaintiff parked his vehicle beside of Defendant Zayas' vehicle. *Id.* Defendant Zayas and Plaintiff spoke, and Plaintiff exited his vehicle to look at the unit while Stokes and Johnson remained in the vehicle. *Id.* Plaintiff subsequently returned to his vehicle, and Defendant Zayas made an excuse to move away from Plaintiff and the storage unit and gave a signal to the SRT to proceed with the arrest. *Id.* Defendant Zayas was not involved with the arrest and did not see the events immediately preceding it. *Id.*

Assistant Special ATF Agent in Charge Charles E. Smith ("Special Agent Smith") was the leader of the SRT.[3] (Doc. No. 38-1 at 6.) Special Agent Smith attested that when Plaintiff saw the SRT, he placed his vehicle in reverse, accelerated, moved the vehicle a short distance, and stopped. *Id.* at 7. Special Agent Smith said that at that time he observed the front passenger of the vehicle "reach down with one hand and a rifle come up." *Id.* According to Special Agent Smith, Plaintiff then accelerated again, spinning his tires and traveling seemingly in the direction of some of the SRT members. *Id.* Special Agent Smith fired five .223 caliber rounds from an M-4 in the direction of the vehicle, and he stopped firing his weapon when he saw the front passenger drop the rifle. *Id.* at 7.

Special Agent Ruben J. Chavez ("Special Agent Chavez"), Special Agent Jeffrey P.

---

[3]The Court notes that the Declaration filed by Special Agent Smith did not contain the second page.

Brouse ("Special Agent Brouse"), and Special Agent Eric A. Bauer ("Special Agent Bauer") attested that they were part of the SRT and that Defendant Zayas warned the SRT prior to Plaintiff's arrest that the front passenger in Plaintiff's vehicle had a rifle at his feet.[4] (Doc. No. 38-1 at 10, 14, 18.) They further stated that when Defendant Zayas gave the prearranged signal, Special Agent Smith ordered the arrest be initiated at which time, the SRT exited the storage unit, shouted "Police," and began to spread out around the front of Plaintiff's vehicle. *Id.*

Plaintiff was in the driver seat, Stokes was in the front passenger seat, and Johnson was in the back seat. (Doc. No. 38-1 at 14; Doc. No. 50 at 15, 17, 19.) According to Special Agents Chavez, Brouse, and Bauer no one exited the vehicle pursuant to the SRT's orders, but instead Plaintiff put the vehicle in reverse, accelerated, backed up a short distance, and stopped. *Id.* at 10, 14, 18. Special Agent Brouse attested that he saw the front passenger reach down, and although he did not see the rifle, he believed the passenger was reaching for it. *Id.* at 14-15. Special Agent Chavez, Brouse, and Bauer indicated that Plaintiff then accelerated the vehicle again in the direction of some of the SRT members, at which time they fired at the vehicle. *Id.* at 11, 15, 18-19.

Special Agent Chavez fired one slug round from a shotgun. *Id.* at 11. Special Agent Brouser stated that he fired three rounds from an AR-10 toward the front passenger because it appeared that the front passenger was attempting to raise an assault rifle. *Id.* at

---

[4]Special Agent Chavez and Bauer were located in the storage unit prior to the initiation of the arrest, and Special Agent Brouser was positioned on the roof of a storage building. (Doc. No. 38-1 at 10, 14, 17).

15. Special Agent Bauer attested that he fired one 37 millimeter baton round from a Sage SL6 at the windshield because he was in fear of his life and thought it was possible the driver was going to hit some SRT members with the vehicle. *Id.* at 19. Special Agent Bauer's baton round bounced off of the window. *Id.* Three of the rounds fired by the SRT penetrated the front window of the vehicle. *Id.* at 7, 11, 15, 19. After Plaintiff's vehicle stopped, the SRT arrested Plaintiff, Stokes, and Johnson without further incident, and the vehicle was searched, resulting in the confiscation of an assault rifle and two semiautomatic pistols from the front passenger seat area. *Id.*

Contrary to Special Agent Smith, Chavez, Brouser, and Bauer's attestations, Plaintiff attested that when the SRT identified themselves, he immediately placed both of his hands on the windshield of the vehicle in surrender. (Doc. No. 50 at 15.) Plaintiff stated that he did not make any movements or threatening gestures toward any ATF agent during the arrest nor did he observe Stokes raise a rifle during the arrest. *Id.* Stokes also attested that he did not make any threatening moves toward any ATF agents nor did he raise a rifle from the front passenger seat. (Doc. No. 50 at 17.) Similarly, Johnson attested that the ATF agents opened fire immediately after identifying themselves, neither he nor Stokes raised a weapon, and Plaintiff placed his hands on the windshield of the vehicle. (Doc. No. 50 at 19.)

Special Agent Christopher Felski ("Special Agent Felski") attested that he was supporting the SRT, in the capacity of a medic, during the arrest of Plaintiff, Stokes, and Johnson. (Doc. No. 38-1 at 21.) Special Agent Felski assessed Plaintiff after the arrest. *Id.*

at 22. According to Special Agent Felski, Plaintiff only complained about glass fragments causing lacerations to his face, and Plaintiff had no gunshot wounds. *Id.* Plaintiff was treated at Orlando Regional Medical Center and was released to federal custody on the same afternoon. *Id.*

On June 15, 2007, a criminal complaint was filed against Plaintiff, Stokes, and Johnson in the United States District Court for the Middle District of Florida, Orlando Division. (Criminal Case 6:07-cr-104-Orl-22KRS, Doc. No. 1.) Plaintiff subsequently was charged by indictment with conspiracy to commit robbery obstructing interstate commerce (also known as "Hobbs Act robbery")(count one), conspiracy to distribute cocaine (count two), using and carrying a firearm in furtherance of conspiracy to commit Hobbs Act robbery and conspiracy to distribute cocaine (count three), and possession of a firearm by a convicted felon. *Id.* at Doc. No. 25. Petitioner entered a plea of guilty as charged on October 1, 2007. *Id.* at Doc. No. 128.

## II. Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if it appears that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing that there is no genuine issue of material fact lies on the moving party, and it is a stringent one. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rule 56(e) further provides as follows:

> When a motion for summary judgment is made and supported as provided on this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts

showing there is a genuine issue of fact for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Essentially, the nonmoving party, so long as that party has had an ample opportunity to conduct discovery, must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If, after the movant makes its showing, the nonmoving party brings forth evidence in support of its position on an issue for which it bears the burden of proof at trial that "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (citations omitted).

*III.   Analysis*

Defendant Zayas and the other unknown Defendant ATF agents contend that they are entitled to qualified immunity. In support of their motion, Defendants note that Defendant Zayas was not involved in Plaintiff's arrest and the use of force during the arrest was objectively reasonable such that there was no violation of the Fourth Amendment.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (citation omitted) (quotation omitted). To be entitled to qualified immunity, a government official first must demonstrate that "he was acting within the

7

scope of his discretionary authority when the allegedly wrongful acts occurred." *Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)). If the defendant satisfies this burden, then the Court must grant qualified immunity unless the plaintiff can demonstrate first, that the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the officers; and, second, that it was clearly established at the time of the incident that the actions of the defendant were unconstitutional. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009). Courts are permitted to exercise discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson*, 129 S. Ct. at 818.

In the instant case, based on the allegations in the amended complaint and the evidence presented, the Court concludes that Defendants were acting in the scope of their discretionary authority when the incident occurred. Accordingly, the Court will consider whether Plaintiff has alleged a constitutional violation.

In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's "objective reasonableness" standard. *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989)).

> Reasonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect

> resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force. *Penley*, 605 F.3d at 850. Perspective also is crucial to the analysis: "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded."

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quoting *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009)). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

The Eleventh Circuit has held that an officer is "entitled to qualified immunity if he 'reasonably could have believed that probable cause existed, in light of the information [he] possessed[,]' to shoot [the suspect], even if that belief was mistaken." *Jean-Baptiste*, 627 F.3d at 821 (quoting *Garczynski*, 573 F.3d at 1167). Furthermore, an officer's "use of force is judged objectively, and he is shielded from liability 'unless application of [that] standard would inevitably lead every reasonable officer in [his] position to conclude the force was unlawful.'" *Id.* (citing *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

The evidence presented establishes that Defendants intended to arrest Plaintiff, Stokes, and Johnson on the date of the shooting for conspiring to commit an armed robbery. Defendants were aware that Plaintiff and his co-defendants intended to kill the individuals in the home during the planned robbery. Moreover, immediately prior to the arrest, Defendant Zayas observed an assault rifle in the front passenger side of the vehicle, and he notified the SRT members that a rifle was in the vehicle.

Viewing the evidence in the light most favorable to Plaintiff, however, an issue of

fact exists as to whether (1) Stokes made movements to reach for a rifle or actually raised a rifle and (2) Plaintiff made any movements toward the SRT during the arrest. Although Special Agents Smith, Chavez, Brouse, and Bauer attested that Plaintiff placed the vehicle in reverse and accelerated the vehicle during the arrest, Plaintiff attested that he did not "make any movements or threatening gestures toward the A.T.F. agents during the arrest."[5] (Doc. No. 50 at 15.) Furthermore, Stokes attested that he did not raise a rifle or make any threatening movements toward the SRT. (Doc. No. 50 at 17.)

In *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005), the Eleventh Circuit held that an officer who shot and killed a suspect during an arrest did not use excessive force in violation of the Fourth Amendment and was entitled to summary judgment. The facts surrounding the shooting were summarized as follows:

> Members of the Atlanta High Intensity Drug Trafficking Area ("HIDTA") Task Force arrested two individuals on June 6, 2001. . . for selling nine ounces of heroin to an undercover agent. One of the suspects agreed to cooperate by assisting the agents in apprehending his suppliers. He arranged to meet his suppliers later that day, under the pretense of delivering the funds he received from the sale of heroin.
>
> That afternoon, the HIDTA agents gathered by a doughnut shop on Ponce where the delivery was to take place. The cooperating suspect identified a Ford Escort carrying three passengers as the vehicle in which his suppliers were driving. Arrugueta, a special agent employed by the Immigration and

---

[5]The Court notes that Plaintiff submitted a police investigative report in support of his motion for summary judgment which indicates that Johnson told law enforcement officers after the arrest that Plaintiff placed the vehicle "in reverse to drive off but only traveled a short distance." (Doc. No. 40 at 15.) The report, however, is hearsay, and the Court cannot rely on the report in ruling on Defendants' motion for summary judgment.

10

> Naturalization Service, followed the Escort in an unmarked vehicle. The Escort... stopped three to four feet behind a civilian car waiting at a traffic light on the corner of Ponce and Argonne Avenue. The driver of the vehicle and a passenger then exited the Escort and began walking toward the doughnut shop. All units converged upon them. Both suspects were arrested promptly thereafter.
>
> Walters, the remaining suspect who apparently had also exited the Escort and then re-entered, was sitting somewhere in between the front right passenger seat and the driver's seat. Arrugueta had exited his car and stood in between the Escort and the car in front of it. The distance between Arrugueta and the Escort was only two to four feet at the most. Arrugueta pointed his gun at Walters, verbally identified himself as "Police," and told him to put his hands up. Walters made eye contact with Arrugueta, but defied the order to raise his hands. Instead, Walters grinned at Arrugueta as the Escort slowly began to move forward at a likely speed of around one to two miles per hour. Thus, Arrugueta had, at most, 2.72 seconds to react before getting crushed between the two cars. As Arrugueta tried to get out of the way of the moving car, he shot Walters through the windshield.

*Robinson*, 415 F.3d at 1253-54 (footnotes omitted). In concluding that the district court incorrectly determined that the officer's conduct violated the Fourth Amendment, the Eleventh Circuit noted that the determination of reasonableness must be made from the perspective of the officer, even though the facts had to be viewed in the light most favorable to the plaintiff. *Id.* The Court reasoned that the evidence demonstrated that the officer was standing in a narrow space between two vehicles, the suspect disobeyed the officer's orders to put his hands up, and the vehicle suddenly began to move forward, requiring the officer to make a split-second decision. *Id.* From these facts, the Court determined that the officer believed his life was in danger and the officer's use of force was

11

not excessive "[b]ecause it is constitutionally reasonable for an officer to use deadly force when a suspect is threatening escape and possible harm to others, [and] it is also constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Id.* at 1256.

Unlike the facts in *Robinson*, in the instant case, an issue of fact exists as to whether Plaintiff, Stokes, or Johnson disobeyed the orders of the SRT, made any threatening movements, or moved the vehicle. As such, the Court concludes that the unknown ATF Defendant agents are not entitled to qualified immunity at this time because a genuine issue of fact exists as to whether it was reasonable for these Defendants to use deadly force.

With respect to Defendant Zayas, however, the Court concludes that he is entitled to qualified immunity. The evidence demonstrates that Defendant Zayas was not involved in the actual arrest of Plaintiff, and thus, Defendant Zayas did not use any excessive force against Plaintiff. Furthermore, there is no evidence that Defendant Zayas directed the other Defendants to shoot at Plaintiff's vehicle. As such, Plaintiff has not shown that Defendant Zayas violated the Fourth Amendment, and Defendant Zayas is entitled to summary judgment.

Accordingly, it is hereby **ORDERED** as follows:

1. Defendants Richie Zayas and the Unknown Agents' Motion for Summary Judgment (Doc. No. 38) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is granted as to Defendant Zayas and denied as to the Unknown Agents. The Clerk of Court is directed to enter judgment in favor of Defendant Zayas.

2. Plaintiff's Motion for Summary Judgment (Doc. No. 40) is **DENIED**.

3. Within **TWENTY (20) DAYS** from the date of this Order, Plaintiff shall notify the Court of the names of the individuals he intends to substitute in place of the Unknown Agents.[6] Furthermore, Plaintiff must complete each of the enclosed forms <u>for each the names he provides as substitutes for the Unknown Agents</u>:

    A.    Notice of a Lawsuit and Request to Waive Service of a Summons

        Plaintiff write his name, the defendants' names, and the case number in the designated spaces on the top of the Notice of a Lawsuit and Request to Waive Service of a Summons Form. Plaintiff should write in "30" in the blank in the phrase, "within ___ days...." <u>PLAINTIFF MUST SIGN THE NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS FORM.</u> Plaintiff <u>should not</u> fill in the date in the line following the sentence that reads: "I certify that this request is being sent to you on the date below."

        Plaintiff must return the original and one copy of the completed Notice of Lawsuit and Request for Waiver of Service of a Summons.

    B.    Waiver of the Service of Summons

        Plaintiff shall write his name, the defendants' names, and the case number in the designated spaces on the top of the form. Plaintiff must return the original and one copy of the completed Waiver of the Service of Summons. <u>PLAINTIFF SHOULD NOT COMPLETE OR SIGN ANY OF THE BLANKS AFTER THE SENTENCE STATING, "If I fail to do so, a default judgment will be entered against me or the entity I represent."</u>

    C.    Marshal's form (Form 285)

---

[6] Discovery has been conducted. As such, Plaintiff should be able to identify the names of the unknown agents at this time.

Plaintiff is required to fill in his name and address and the name(s) and address(es) of Defendant(s) in the appropriate spaces on the Marshal's form. **PLAINTIFF MUST SIGN THE 285 FORM.**

The Clerk of Court is directed to mail the above-mentioned forms to Plaintiff, and he must then mail the completed forms to the Clerk's Office. The completed forms and the names of the substituted Defendants must be returned to the Clerk's Office within **TWENTY (20) DAYS** from the date of this Order. Failure to do so within this time period will result in dismissal for failure to prosecute without further notice.

4. Within **TWENTY (20) DAYS** from the date of this Order, Defendant Unknown Agents shall file a brief addressing whether personal service on the named substituted Defendants is required, and if so, whether these Defendants intend to waive personal service.

**DONE AND ORDERED** in Orlando, Florida, this 31st day of March, 2011.

JOHN ANTOON II
UNITED STATES DISTRICT JUDGE

Copies to:
OrlP-1 3/31
Charlie John Williams
Counsel of Record