UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHARLIE JOHN WILLIAMS,

     Plaintiff,

v.                                                                      Case No. 6:09-cv-912-Orl-28DAB

RICHIE ZAYAS, et al.,

     Defendants.

_____

## ORDER

     This case is before the Court on Defendants' Eric A. Bauer, Jeffrey P. Brouse, Ruben J. Chavez, and Charles R. Smith[1] (collectively "Defendants") Motion for Summary Judgment (Doc. No. 68) and Plaintiff's Response in Opposition to the Motion for Summary Judgment (Doc. No. 75).  As discussed hereinafter, Defendants' Motion for Summary Judgment is granted.

## I.   Factual Background[2]

     Plaintiff, a federal prisoner proceeding *pro se*, filed the instant civil rights action alleging that Defendants used excessive force against him in violation of the Eighth Amendment.[3]  (Doc. No. 6 at 8.)  The facts surrounding the incident forming the basis of

_____

[1]Defendants are agents of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

[2]In considering the motion for summary judgment, the statement of facts is derived from the Amended Complaint, declarations of the parties, and a CD, which shows the incident.

[3]Although Plaintiff asserted a claim of excessive force in violation of the Eighth Amendment, the Court has previously construed Plaintiff's claim of excessive force during

Plaintiff's claim are as follows.  In June 2007, the ATF and the Orange County Sheriff's Office ("OCSO") began investigating a group known as the Corporate Thugz Entertainment Crew as suspects in armed robberies, armed home invasions, narcotic trafficking, illegal firearms, and homicides.  (Doc. No. 68-1 at 2.)  As a result of the investigation on June 14, 2007, Richie Zayas ("Zayas"),[4] working undercover, met with Plaintiff, Mercutio Stokes ("Stokes"), and Kylund Johnson ("Johnson") at a restaurant in Orlando, Florida to discuss a home invasion robbery the four planned to commit that day. *Id.* at 3.  Plaintiff told Zayas in relation to the robbery that "the plan was to kill everyone present in the stash house as soon as they entered." *Id.* at 2.  Zayas also indicated that Plaintiff in discussing the planned robbery said that the police would not be able to handle them. *Id.*

Based on the investigation, the ATF and OCSO intended to arrest Plaintiff, Stokes, and Johnson that day. *Id.*  The ATF formed a Special Response Team ("SRT") to effectuate the arrest.  Zayas directed Plaintiff to drive to a storage facility which Zayas indicated had been rented by him to store his share of the cocaine they intended to steal during the robbery. *Id.* at 3.  Plaintiff followed Zayas in his vehicle to the storage facility. *Id.*  While in route to the storage unit, Zayas advised the SRT that he had observed a rifle in the

---

his arrest to allege a violation of the Fourth Amendment. See Doc. No. 25 at 5 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002), for the proposition that "[t]he Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.").

[4]Zayas was previously granted summary judgment in this case.  (Doc. No. 54.)

vehicle at the feet of the front passenger. *Id.*

Once Plaintiff, Stokes, and Johnson arrived at the storage unit, Plaintiff parked his vehicle next to Zayas' vehicle. *Id.* Zayas and Plaintiff spoke, and Plaintiff exited his vehicle to look at the storage unit while Stokes and Johnson remained in the vehicle. *Id.* Plaintiff subsequently returned to his vehicle, and Zayas made an excuse to move away from Plaintiff and the storage unit. After moving away, Zayas gave a signal to the SRT to proceed with the arrest. *Id.* Zayas was not involved with the arrest and did not see the events immediately preceding it. *Id.*

Assistant Special ATF Agent in Charge Charles E. Smith was the leader of the SRT. (Doc. No. 68-1 at 6.) Defendant Smith stated that prior to arriving at the storage facility, Zayas warned the SRT that a rifle was in Plaintiff's vehicle in the floor by the front passenger's feet. *Id.* at 7. Smith attested that after he ordered the SRT to initiate the arrest, they exited the storage unit, wearing SRT ballistics vests and shouting "Police!" *Id.* At the same time that the SRT exited the storage unit, Plaintiff engaged the break on his vehicle, then took his foot off of the break, accelerated a short distance in reverse, but stopped after there was a loud noise and white smoke from a noise flash diversionary device behind his vehicle. *Id.* at 8. Defendant Smith indicated that neither Plaintiff nor his co-conspirators exited the vehicle in accordance with the SRT's orders. *Id.* at 8. Instead, Defendant Smith stated that after the vehicle stopped, he observed the front passenger of Plaintiff's vehicle reach down and pick up a rifle. *Id.* Defendant Smith said that he believed that the front passenger of the vehicle would fire at the SRT given that Zayas had reported that Plaintiff

3

and his co-conspirators had said they would kill the first police officer who responded to the scene of the planned robbery. *Id.* at 8. According to Defendant Smith, the SRT continued to shout at Plaintiff and his passengers to exit the vehicle, but Plaintiff again accelerated his vehicle in reverse, traveling in the direction of the SRT members located at the south end of the storage facility. *Id.* Defendant Smith attested that he fired five .223 caliber rounds from an M-4 in the direction of the vehicle and stopped firing his weapon when he saw the front passenger drop the rifle. *Id.* Plaintiff and his passengers subsequently exited the vehicle and were arrested without further incident. *Id.*

Defendant Ruben J. Chavez, Defendant Jeffrey P. Brouse, and Defendant Eric A. Bauer attested that they were part of the SRT.[5] They affirmed Defendant Smith's account of the incident, except Defendants Chavez and Bauer did not indicate that they saw the front passenger of the vehicle reach down or raise a rifle. (Doc. No. 68-1 at 11-21.) Likewise, Defendant Brouse stated that he saw the front passenger of the vehicle reach down; however, he did not see a rifle but thought that the passenger was reaching for the rifle. *Id.* at 17.

Special Agent Chavez attested that he fired one slug round from a shotgun at the vehicle because he thought the SRT members at the south of the storage facility were in danger because the vehicle was moving in their direction and a rifle was in the vehicle. (Doc. No. 68-1 at 13.) Special Agent Brouse stated that he fired three rounds from an AR-10

---

[5]Special Agent Chavez and Bauer were located in the storage unit prior to the initiation of the arrest, and Special Agent Brouse was positioned on the roof of a storage building. (Doc. No. 38-1 at 10, 14, 17).

4

toward the front passenger because the vehicle was traveling in the direction of SRT members and it appeared that the front passenger was attempting to raise an assault rifle to fire at SRT members who were in front of the vehicle. *Id.* at 17. Special Agent Bauer attested that he fired one 37 millimeter baton round from a Sage SL6 at the windshield because he was in fear of his life and thought it was possible the driver was going to hit some SRT members with the vehicle. *Id.* at 21. Special Agent Bauer's baton round bounced off the window of the vehicle. *Id.*

Three of the rounds fired by Defendants penetrated the front window of the vehicle. *Id.* The SRT found an assault rifle, a .380 caliber semiautomatic pistol, and a .32 caliber semiautomatic pistol in the front passenger area of the vehicle when they searched it. *Id.* at 8-9. Plaintiff did not suffer a gunshot wound as a result of the incident. *Id.* at 25. He did, however, sustain some lacerations to his face and chest from glass fragments. *Id.* at 25, 33, 37.

Contrary to Special Agent Smith, Chavez, Brouser, and Bauer's attestations, Plaintiff attested that when the SRT identified themselves, he immediately placed both of his hands on the windshield of the vehicle in surrender. (Doc. No. 75 at 9.) Plaintiff stated that he "posed no threat to any of the [SRT members], nor did [he] possess any type of weapon. . . ." *Id.* He further attested that he did not observe Stokes raise a rifle during the arrest. *Id.* at 10. Stokes also attested that he did not make any threatening moves toward any ATF agents nor did he raise a rifle from the front passenger seat. (Doc. No. 50 at 17.) Similarly, Johnson attested that the ATF agents opened fire immediately after identifying themselves,

5

neither he nor Stokes raised a weapon, and Plaintiff placed his hands on the windshield of the vehicle. (Doc. No. 50 at 19.)

On June 15, 2007, a criminal complaint was filed against Plaintiff, Stokes, and Johnson in the United States District Court for the Middle District of Florida, Orlando Division. (Criminal Case 6:07-cr-104-Orl-22KRS, Doc. No. 1.) Plaintiff subsequently was charged by indictment with conspiracy to commit robbery obstructing interstate commerce (also known as "Hobbs Act robbery")(count one), conspiracy to distribute cocaine (count two), using and carrying a firearm in furtherance of conspiracy to commit Hobbs Act robbery and conspiracy to distribute cocaine (count three), and possession of a firearm by a convicted felon. *Id.* at Doc. No. 25. Petitioner entered a plea of guilty as charged on October 1, 2007. *Id.* at Doc. No. 128.

## II.   *Standard for Summary Judgment*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if it appears that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing that there is no genuine issue of material fact lies on the moving party, and it is a stringent one. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rule 56(e) further provides as follows:

> When a motion for summary judgment is made and supported as provided on this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing there is a genuine issue of fact for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

6

Essentially, the nonmoving party, so long as that party has had an ample opportunity to conduct discovery, must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If, after the movant makes its showing, the nonmoving party brings forth evidence in support of its position on an issue for which it bears the burden of proof at trial that "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (citations omitted).

## III.   Analysis

Defendants contend that they are entitled to qualified immunity. In support of their motion, Defendants argue that the use of force during the arrest was objectively reasonable such that there was no violation of the Fourth Amendment.[6]

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[6]In a prior order denying summary judgment in favor of the then unknown ATF agents, the Court determined that an issue of fact existed as to whether (1) Stokes made movements to reach for a rifle or actually raised a rifle and (2) Plaintiff made any movements toward the SRT during the arrest. (Doc. No. 54 at 9-10.) In so ruling, the Court reasoned that Plaintiff attested that he did not "make any movements or threatening gestures toward the A.T.F. agents during the arrest" and "Stokes attested that he did not raise a rifle or make any threatening movements toward the SRT." *Id.* at 10. The Court was required to accept the veracity of Plaintiff's averments as it did not have the CD of the incident for consideration in the disposition of the initial motion for summary judgment.

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted) (quotation omitted).  To be entitled to qualified immunity, a government official first must demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (quoting *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983)).  If the defendant satisfies this burden, then the Court must grant qualified immunity unless the plaintiff can demonstrate first, that the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the officers; and, second, that it was clearly established at the time of the incident that the actions of the defendant were unconstitutional. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009).  Courts are permitted to exercise discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson*, 555 U.S. at 236.

In the instant case, based on the allegations in the amended complaint and the evidence presented, the Court concludes that Defendants were acting in the scope of their discretionary authority when the incident occurred.  Accordingly, the Court will consider whether Plaintiff has alleged a constitutional violation.

In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's "objective reasonableness" standard. *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985), and

*Graham v. Connor*, 490 U.S. 386 (1989)).

> Reasonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force. *Penley*, 605 F.3d at 850. Perspective also is crucial to the analysis: "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded."

*Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quoting *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009)). "In addition, other considerations include: '(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically.'" *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008)). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

The Eleventh Circuit has held that an officer is "entitled to qualified immunity if he 'reasonably could have believed that probable cause existed, in light of the information [he] possessed[,]' to shoot [the suspect], even if that belief was mistaken." *Jean-Baptiste*, 627 F.3d at 821 (quoting *Garczynski*, 573 F.3d at 1167). Furthermore, an officer's "use of force is judged objectively, and he is shielded from liability 'unless application of [that] standard would inevitably lead every reasonable officer in [his] position to conclude the force was

unlawful.'" *Id.* (citing *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

In the instant case, viewing the evidence in the light most favorable to Plaintiff, the evidence supports the conclusion that Defendants' use of force was objectively reasonable upon consideration of the relevant factors. Defendants intended to arrest Plaintiff, Stokes, and Johnson on the date of the shooting for conspiring to commit an armed robbery. Defendants were aware that Plaintiff and his co-conspirators intended to kill the individuals present in the home, including the first law enforcement official who intervened during the planned robbery. Moreover, immediately prior to the arrest, Zayas observed an assault rifle in the front passenger side of the vehicle, and he notified the SRT members that a rifle was in the vehicle within access of one of the passengers.

Furthermore, from review of the CD[7] of the incident, it is clear that when the SRT attempted to effectuate the arrest of Plaintiff and his co-conspirators, Plaintiff accelerated the vehicle in reverse, which Defendants attested was in the direction of members of the SRT who were positioned to the south of the storage facility.[8] Although Plaintiff has attested that neither he, nor Stokes, nor Johnson made "any movements or threatening gestures toward the A.T.F. agents during the arrest," *see* Doc. No. 75 at 10, this statement is refuted by the CD, which shows the vehicle accelerating at medium to fast speed toward

_____

[7]The CD is silent and does not show the movements of the passengers inside the vehicle.

[8]The CD does not show the members of the SRT who were south of the storage facility. However, Plaintiff has not refuted Defendants' attestations that there were members of the SRT located to the south of the storage facility.

SRT members, as attested by Defendants.[9] Thus, based on unrefuted evidence, at the time of the incident Defendants knew that (1) Plaintiff and his co-conspirators intended to commit a serious crime and were willing to shoot police officers, (2) Plaintiff and his co-conspirators posed an immediate danger to the SRT members because their vehicle was accelerating toward SRT members and an assault rifle was within reach of one of the occupants of the vehicle, and (3) Plaintiff and his co-conspirators were attempting to evade arrest as Plaintiff initially stopped the vehicle but subsequently accelerated in reverse.

Moreover, from the moment that Plaintiff accelerated the vehicle until he stopped, a total of approximately four seconds transpired. Thus, the feasibility of providing additional warnings to Plaintiff to stop before shooting at the vehicle was questionable given the speed the vehicle was traveling and the need to take steps to stop the vehicle from further endangering SRT members. Although Defendants fired a total of ten shots at the vehicle, which is arguably excessive, given that Defendants knew that Plaintiff and his co-conspirators were likely to fight back, Defendants were justified in firing more shots than in fact were necessary to stop the vehicle. Moreover, only three of the ten shots penetrated the front windshield, and Defendant Bauer's shot actually bounced off of the windshield.[10]

---

[9]The Court is mindful that a question of fact exists as to whether Stokes reached down in the vehicle or raised a rifle during the incident. Thus, the decision to grant summary judgment is not premised on Stokes' purported movements.

[10]If summary judgment was not appropriate for all Defendants, the Court would nevertheless grant summary judgment to Defendant Bauer because his shot did not penetrate the vehicle. As such, there can be no question that Defendant Bauer did not use

Likewise, Plaintiff's injuries were minimal.[11] Plaintiff did not suffer a gunshot wound. Instead, he sustained lacerations to his face and chest from glass fragments. Finally, in light of the circumstances, there is no indication that the force Defendants used was malicious and sadistic. Instead, the CD shows that Defendants fired shots at the vehicle in good faith only after it accelerated toward SRT members.

In *Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005), the Eleventh Circuit held that an officer who shot and killed a suspect during an arrest did not use excessive force in violation of the Fourth Amendment and was entitled to summary judgment. The facts surrounding the shooting were summarized as follows:

> Members of the Atlanta High Intensity Drug Trafficking Area ("HIDTA") Task Force arrested two individuals on June 6, 2001. . . for selling nine ounces of heroin to an undercover agent. One of the suspects agreed to cooperate by assisting the agents in apprehending his suppliers. He arranged to meet his suppliers later that day, under the pretense of delivering the funds he received from the sale of heroin.
>
> That afternoon, the HIDTA agents gathered by a doughnut shop on Ponce where the delivery was to take place. The cooperating suspect identified a Ford Escort carrying three passengers as the vehicle in which his suppliers were driving. Arrugueta, a special agent employed by the Immigration and Naturalization Service, followed the Escort in an unmarked vehicle. The Escort. . . stopped three to four feet behind a civilian car waiting at a traffic light on the corner of Ponce and Argonne Avenue. The driver of the vehicle and a passenger then exited the Escort and began walking toward the doughnut shop. All units converged upon them. Both

---

excessive force.

[11]The Court notes that Stokes and Johnson were shot during the incident.

suspects were arrested promptly thereafter.

> Walters, the remaining suspect who apparently had also exited the Escort and then re-entered, was sitting somewhere in between the front right passenger seat and the driver's seat. Arrugueta had exited his car and stood in between the Escort and the car in front of it. The distance between Arrugueta and the Escort was only two to four feet at the most. Arrugueta pointed his gun at Walters, verbally identified himself as "Police," and told him to put his hands up. Walters made eye contact with Arrugueta, but defied the order to raise his hands. Instead, Walters grinned at Arrugueta as the Escort slowly began to move forward at a likely speed of around one to two miles per hour. Thus, Arrugueta had, at most, 2.72 seconds to react before getting crushed between the two cars. As Arrugueta tried to get out of the way of the moving car, he shot Walters through the windshield.

*Robinson,* 415 F.3d at 1253-54 (footnotes omitted). In concluding that the district court incorrectly determined that the officer's conduct violated the Fourth Amendment, the Eleventh Circuit noted that the determination of reasonableness must be made from the perspective of the officer, even though the facts had to be viewed in the light most favorable to the plaintiff. *Id.* The Court reasoned that the evidence demonstrated that the officer was standing in a narrow space between two vehicles, the suspect disobeyed the officer's orders to put his hands up, and the vehicle suddenly began to move forward, requiring the officer to make a split-second decision. *Id.* From these facts, the Court determined that the officer believed his life was in danger and the officer's use of force was not excessive "[b]ecause it is constitutionally reasonable for an officer to use deadly force when a suspect is threatening escape and possible harm to others, [and] it is also constitutionally reasonable for an officer to use deadly force when he has probable cause

13

to believe that his own life is in peril." *Id.* at 1256.

After review of the CD, the Court concludes that this case is analogous to *Robinson*. Plaintiff disobeyed the orders of the SRT and accelerated the vehicle in the direction of SRT members. Like the facts in *Robinson*, Plaintiff was threatening escape and possible harm to others requiring Defendants to make a split-second decision. The Court concludes, therefore, that Defendants did not use excessive force because the force was objectively reasonable under the circumstances of this case. Thus, Plaintiff has not shown that Defendants violated the Fourth Amendment, and Defendants are entitled to qualified immunity.

Accordingly, it is hereby **ORDERED** as follows:

1.     Defendants Eric A. Bauer, Jeffrey P. Brouse, Ruben J. Chavez, and Charles R. Smith's Motion for Summary Judgment (Doc. No. 68) is **GRANTED**.

2.     The Clerk of Court is directed to enter judgment in favor of Defendants and close this case.

**DONE AND ORDERED** in Orlando, Florida, this __5__ day of December, 2011.

JOHN ANTOON II
UNITED STATES DISTRICT JUDGE

Copies to:
OrlP-1 12/1
Charlie John Williams
Counsel of Record

14